Case number 20-5043. Henry Geter, Appellants v. United States Government Publishing Office. Mr. Hurst appointed amicus curiae for the appellants. Mr. Dreyer for the appellate. Thank you, Your Honor. May it please the Court. My name is Scott Ballinger. I'm the director of the Appellate Litigation Clinic at the University of Virginia School of Law, and it's my pleasure to introduce Mr. Ian Hurst, a third-year law student, who will be presenting argument as a court-appointed amicus curiae in support of Mr. Geter. Thank you, Mr. Ballinger. Thank you for your service in this case, and we'll hear from you now, Mr. Hurst. May it please the Court. Congress passed the ADA to integrate individuals with disabilities into the mainstream of American life, so if an employee gets injured or disabled, the employer can't just fire them. So long as it doesn't cause an undue hardship, and so long as the employee is qualified, the employer is required to consider reassignment to a vacant position. Now, the district court held that the employer's reassignment obligations only include formal vacancies, and that reading is wrong for two reasons. There's nothing in the text of the ADA that justifies that limitation. The Supreme Court held in Barnett that vacant just means, or it held in Barnett that vacant has no specialized meaning under the ADA, and this court held in McFadden that vacant means not held, filled, or occupied. So an employer is light-duty vacancies. To the district court's credit, sometimes those vacancies will be posted on a job listing, but not always. Sometimes positions are filled internally, and that's this case, and there are light-duty programs across the country, and I'll give you a few examples. In Johnson v. Brown, for example, a medical center reassigned injured employees to temporary light-duty positions in the operating room, and then in Michelin v. Tire Company, the company reassigned injured employees to a light-duty position in the decomplexing unit. I'd like to back up for a moment, counsel, to kind of a more basic and fundamental issue I see with this case. The medical documentation that Mr. Gieter relied on below was a letter from 2012 from Dr. Doran, and that said that his disability had ceased in 2012 as of the date of the examination, and so it's now the end of 2013, and Gieter was asked for more documentation, and he didn't provide any documentation and didn't respond to the December 2013 letter. Why isn't that essentially abandoning the interactive process in sufficient grounds in and of itself to affirm? Two responses, your honor. In Dr. Doran's letter, he explained that Gieter's disability was permanent, and a permanent disability does not expire, and the second point is that Gieter started the interactive process on November 25, 2013, and the GPO's policies require that Robinson respond in 10 days. It took him 20 days to respond, and when he did respond, he asked for further medical documentation. The GPO's policies outline that the interactive process is a flexible give and take, and it doesn't require that Gieter use any special words to start that process. The request for medical documentation is near the end of that process if they wanted to dispute that Gieter no longer had a medical condition. But the Doran letter said that he can return to his work as a truck driver, that he could do everything required of a truck driver except that the truck driver was supposed to be able to lift up to 50 pounds, and Gieter could only lift up to 30 pounds, but to the extent that there was ever something over 30 pounds that needed to be lifted, he would have a helper who could do that, and thus he could perform his job. I mean, that's what the letter that Mr. Gieter is relying upon says, that he could return to his job. Well, Dr. Doran's letter said that his disability was permanent, so Gieter was understandably confused when Robinson asked for additional information in the 2013 letter. Just out of curiosity, I'm not sure it's in the record, did he ever pay the $4,000 tickets? Gieter got his CDL reinstated, and he didn't get his CDL reinstated, he got the medical conditions cleared, so he was able to reobtain his CDL in 2014, but then afterwards the GPO fired him. Yeah, the record doesn't show whether he ever paid the tickets or not. I apologize, your honor, I don't think anywhere in the record it shows whether or not he paid tickets, but he was medically cleared to reobtain his CDL in 2014 before he was fired. Just so that I'm clear, are you saying that the record shows that he did obtain his CDL before he was fired? No, he obtained his CDL after he was fired, but before he was fired, he was cleared to reobtain his CDL, but he did not interact with the evidence on the record of that. That he was medically cleared to reobtain his CDL? Yes. I think that's on joint appendix 108, your honor. Um, yeah, I'm trying to appendix 108. They asked Jeter, did that medical exam clear you to get a CDL in March of 2014? Yes, sir. All right, thank you. You're welcome, your honor. So temporary late duty positions are never posted on a job listing. That's because they're not meant for non-disabled employees or outsiders. For employees who get injured on the job, and they can be left unfilled, just like a formal position. The better approach is to ask what is reasonably available under the employer's existing policies. And the Arlene standard accounts for all vacancies. It has been applied by numerous circuit courts to determine the scope of an employer's reassignment obligations. In this case, the GPO had a policy. They had a policy to assign... Sorry, Judge Cassius. Your honor, did you have a question? I saw a note. Did I click a button by mistake or something? Can you hear me? Yeah, my apologies, your honor. No, go ahead. So the GPO had a policy to fill the vacant, or they had a policy to fill the desk position in their delivery section with injured workers. And the district court said that there was undeniably strong evidence for that practice. We can walk through a rough timeline. Monique Jones had the position between 2010 and 2012. Bobby Graham had the position in 2013. And it was vacant in 2014 when Jeter was fired. In 2015, the GPO gave that position to Mr. I have a couple of questions here. One is that, I mean, the language that you are relying upon on Arlene was from a footnote that was clearly dictum. So it doesn't seem like it really has any, I mean, that the Supreme Court considered the issue at all. And it wasn't dispositive in the case. So why should we hang our hat on that statement? So the Supreme Court was discussing reasonable accommodations in that case. And in footnote, they were talking about the scope of reasonable accommodations. That standard has been applied by a number of circuit courts. And the question was always, what are the employer's actual practices? It's discussing whether tuberculosis was a disability. You're correct, your honor, that was what the court was discussing that Supreme Court case. But in the footnote, they were discussing what the scope of reasonable accommodations were. It's also an ambiguous footnote, right? It's not just that it's clearly dictum. It's even on its own terms, it's ambiguous on whether reasonably available means if you have to reassign to an available vacancy, which is what the statute says, or whether it means you might have to create a vacancy, which is inconsistent with scores of ADA decisions. Your honor, we're not arguing that this means that they have to create a vacancy that would be inconsistent with this court's decision. But if you ask what's reasonably available under the employer's existing policies, then you can determine what positions are available. The reason that's important is because positions aren't always posted on a job listing, and we have to determine. Sorry, your honor. No, I'm sorry, I interrupted you. I'm sorry. But is your theory, your theory is not that there's some duty to create a new position if reasonable, which would be a very aggressive reading of that footnote. Your position is a little bit more modest as I understand it, which is you still need a vacancy, but the vacancy can be informally created or available, right? Is that fair? Yes, your honor. And that's what the evidence shows in this case. I encourage the court to look at the evidence. The supervisor told Gieter there are no positions and Gieter reported that as that's what he heard from the supervisor. So what is the evidence that would tend to undermine that? Your honor, I would encourage you to look at joint appendix 152. That's Robinson's declaration. In that declaration, he swears two things. He swore that he accommodated Mr. Graham with a position in 2015 after Gieter was fired. And he also swore that he didn't create a new position in order to accommodate Mr. Graham. So if he didn't have to create a new position and he put someone else in that position, then that position was vacant at the time that Gieter was fired. So your position is you can get to the jury anytime an employer provided someone with light duty. Then that's enough to get to the jury with the argument that you're entitled to be, your client's entitled to be accommodated. No, your honor, just because an employer reasonably accommodates an employee once, that is on me. No, no, the question whether it is a reasonable accommodation. Your position is that if the employer did one time give somebody light duty, then that created a vacancy or not created a vacancy, but created a policy whereby you're entitled to get to the jury. No, no, your honor. Robinson said that he did not create any new positions. No, I'm just asking, isn't your position that light duty was reasonably available because it had been provided before? That was your position, right? My position in this case is that there was a vacant light duty position because the GP gave that position to another employee. Okay, so anytime an employer provides one person a light duty position, then that employer has created a vacancy, which anybody else is entitled to get, right? And you can get to the jury on that question. No, your honor. In this case, this employer had accommodated two employees with light duty. And then after that- You're telling me there's a distinction between one and two? No, no, your honor. And in this case, I'm arguing that there was a vacancy because they had a practice over eight years of assigning injured employees to a desk position in the delivery office. And that position was vacant in 2014 when Jeter was fired. I can't say whether one, two, or four is sufficient, but the case law has found that one is sufficient. I would direct you to the Woodman case. They found that one was sufficient to create a past practice, but there's much more evidence in this case. So is the evidence in this case that any supervisor besides Robinson did this, or was it just with respect to Robinson, the evidence that we have here? The evidence is just with respect to Mr. Robinson. He personally accommodated four employees to a desk position in the delivery section of the GPO. So what would we do if there were evidence that there was another supervisor, Ms. Smith, and when she was confronted with someone who had a temporary injury, she never put them on light duty. They just simply had to wait until they could come back and be truck drivers. So if Ms. Smith had a different practice, and Ms. Smith had never accommodated any employees, then that would suggest that a position wasn't reasonably available under the employer's existing practices. However, I will note... So it seems like then your argument is contention upon what a particular supervisor does, not based on what the GPO's policies are. And why is that problematic? The courts that have evaluated the Arlene Standard, which is that employers... We have to look at what is reasonably available under the employer's existing policies. In order to do that, they look at the employer's policy and practice. So in some respect, we're always going to look at what the employer's actual practices are. But do we have any evidence here about what GPO's policies are with respect to this type of accommodation? So Robinson, in the deposition testimony, he references what appears to be some sort of formal policy. But to be candid, Your Honor, we tried to find that policy online and we couldn't find anything formally written down. But even in the absence of that policy, the district court characterized the evidence as unbelievably strong that the GPO had a practice of filling a desk position with injured employees. And we think that four different employees being assigned over eight years is sufficient. I guess what I'm having trouble understanding here is that if your case is dependent upon one particular supervisor having a past practice of accommodating others, and then in this case, he chooses for whatever reason to not accommodate Mr. Jeter, then how do we get to the point that this was disability discrimination or failure to provide? I guess your argument is that if he could provide the accommodation to others, it's reasonable here.  No, Your Honor. So the ADA requires that employers reassign injured employees if there is a vacant position. So Mr. Robinson's practice shows that there was a vacancy in the GPO's delivery section. A specific desk. Why is that? If the ultimate question is whether or not there was a vacancy, why would it follow that existence of a vacancy at one time implies the existence of a vacancy at all times or at other times? Your Honor, I'm not arguing for an implied vacancy rule. In this case, a position was vacant. And then Robinson filled that position with another employee. So I don't think any inference is necessary there. And we get that just from the time sequence of when tightness in time between when Jeter did not get the accommodation and when the next driver, Graham, did? You get this from two facts on Joint Appendix 152, Your Honor. The first fact is that Robinson swore that he did not create any new positions for the employees that he accommodated. And he accommodated Bobby Graham in 2015 with a position. So if he didn't create any new positions, and he was able to reassign an employee to a position, that means that the position was vacant. Because he didn't have to create a new position to reassign them. It might mean that someone else was doing the light work when Graham's, I'm sorry, when Jeter's situation came to a head and no one else was doing the position, doing that work when Graham's situation came to a head. In Robinson's declaration, he swears that he only accommodated four employees total between 2010 and 2018. So given that there was only four total employees that did this work between 2010 and 2018, and no one was doing it in 2014, the fact that he was able to then accommodate Mr. Graham with a position in 2015, shows that the vacancy was available when Jeter was fired. He has a right to that position under the ADA. What do we know about the size of relevant universes here? You say four accommodations in 10 years, which sounds pretty good, maybe good for you, but how many drivers are we talking about and how frequently are they injured? Do we have any idea what those numbers look like to try to scope out a plausible denominator? So in this case, we know that four drivers were accommodated between 2010 and 2018, so about eight years in the delivery section. However, in this case, we also argue that the GPO failed to engage in the interactive process. The reason that the interactive process is so important is because the interactive process can then reveal other vacancies, other accommodations that the GPO could have then given to Mr. Jeter. But because the interactive process broke down, we couldn't identify other potential vacancies. We only know about this one because Jeter knew about it and we were able to ask Mr. Robinson about it. But the GPO is a there would have been other vacancies, but we don't know that in this case. Council, whose fault is it that the process broke down? Viewed in the light most favorable to Mr. Jeter, the GPO failed to engage in the interactive process. What about the letter that went to his lawyer? So Jeter asked for a reasonable accommodation in three instances. The interactive process started in November of 2013, and the GPO recognized that he asked for a reasonable accommodation. The GPO recognized this in Boyd's memo on Joint Appendix 187. That started the interactive process, and Robinson was required by the GPO's own policies to respond within 10 days, and he did it. He didn't respond until 20 days later, and he did so in writing, and he didn't bring up Jeter's reasonable accommodation. And the district court, when they looked at this question, they said that every request that Jeter made for a reasonable accommodation was met with delay, obfuscation, or a request for further documentation. The district court was quoting Jeter's argument. That wasn't the district court's finding, was it? That's correct. I see my time has expired if there are no further questions. Let me just take you back to my numbers question. There's 1,700 employees GPO-wide? Yes, Your Honor, that was information we got from a Google search, so approximately 1,700. And you said four accommodations in the delivery. The delivery is the part of GPO in which Jeter worked? That's correct, and all the other employees that... Do we know how many GPO employees are in delivery? No, Your Honor, I apologize. I don't think that's in the record. Or how many GPO drivers there are in delivery? We just said we don't know any of those numbers. No, Your Honor, I apologize. I don't think those are in the record. Or do we know, like, what universe of people might, other than drivers, might be doing this duty work that Graham got to do but Jeter did not? Your Honor, that is information that would come through the interactive process. The reason the ADA requires interactive process... Or through discovery after you file your lawsuit and try to satisfy your burden of proof. Yeah, that's correct, Your Honor. But we still believe that there is a triable case here with the evidence that Jeter has. I see my time has expired, Your Honor, if there are no further questions. So, the concern that is raised by the GPO is that, essentially, if we rule for you and send us back for a trial, we're going to create a situation where, even if that's a plausible kind of reading of the statute in precedent, we shouldn't go down that road because we are going to create a disincentive for people, supervisors, to try to accommodate people when they can because someone will come along and sue when the supervisor makes a decision that it's not really either appropriate or possible to accommodate someone in this circumstance. But they're stuck. Um, even when... Even when... Even though they had no duty to accommodate anyone in the way that they had been doing so by assigning them the temporary light duty. What's your response to that policy concern? So, I think our case is slightly different than the fact pattern that you discussed. In this case, they had a light duty program and then the position became vacant and then they assigned a new employee to that position. So, just because an employer makes an accommodation one time does not mean that they're bound to do so forever. If they just... If Jeter or if Robinson had assigned Mr. Graham to light duty and then he was in light duty when Jeter was fired, then the position would have been held by Mr. Graham. So, Jeter wouldn't have had a right to it. The facts of this case demonstrate that there was a specific vacancy, there's a vacant desk position in the GPO's delivery section. So, if an employer made an accommodation one time and then stopped making that accommodation, then there would be no vacancy. What creates a vacancy in this case is... The reason we know there's a vacancy in this case is because then Mr. Robinson assigned someone else to the position.  What would there be for the jury to decide whether there really was a vacancy? Yes, Your Honor. All right. Any other questions, Judge Katsas, Judge Silberman? No, no questions. All right. We'll give you some time. Well, I know I do have one question. You haven't mentioned your retaliation argument. Is it your view the accommodation argument is stronger for you than the retaliation? It's hard to say, but I think they're both strong arguments for Mr. Jeter. I think... It has to be stronger because he didn't have the CDL. He couldn't have driven the truck at that point. So, I mean, the only thing they could have done was try to find something else for him to do. So, there are a number of ways to conceptualize this issue. The ADA says that... ADA provides a non-exhaustive list of accommodations. And another way to look at this is that Jeter just needed a temporary accommodation. And in jobs, people can't do one aspect of their job for a period of time, and then they can focus on another aspect of their job. Thank you. In the retaliation claim, one of the principal arguments of the GPO, and of course, one of the principal findings of the district court, was that there wasn't sufficient evidence to send this to the jury because temporal proximity alone wasn't sufficient. And the other evidence that you proffered wasn't probative, namely the comparator evidence, because there wasn't enough information that any of those comparators had filed, had similar EEO or other kind of protected activity than Mr. Jeter. You know, looking at the record, why shouldn't we affirm that finding? Your Honor, the GPO had every reason to come forward with evidence that these other employees had filed lawsuits. If Robinson could provide information that these employees had filed lawsuits and then they accommodated them, that would help their position. So we think that because the record is silent on this point actually helps us. And a reasonable jury can still infer pretext, even though the GPO doesn't invariably fire everyone who complains. So we still think that there is sufficient evidence that a reasonable jury can infer pretext. Well, we've held that in order for you to really be able to successfully rely on comparators, you've got to show that they compare. I mean, if you've got nothing in the record about their EEO activity, nothing specific, then it seems that under our case law, they're not adequate comparators. First point, Your Honor, is that the comparator, there is information in the record about their protected activity. That's on Joint Appendix page 153. The comparators did file EEO complaints. And the Jeter and his comparators engaged in different types of protected activity. Jeter filed a federal lawsuit, multiple administrative complaints, and challenged the GPO at the Marist System Protection Board. It is self-evident that different types of protected activity are annoying. Some types of protected activity are more annoying than other types of protected activity. And a reasonable jury can look at the long, contentious history between the GPO and Jeter and infer that their reason for firing him was pretextful. And was this argument made in court? Yes, Your Honor, it's in our opening brief. And then we've... And in our reply brief, yes, that's correct. It's in Section 1, Evaluation Section. No further questions. Thank you, Your Honor. Thank you. We'll give you some time on rebuttal. We'll hear from Douglas Dreyer for the government. Thank you, Your Honor. May it please the court. My name is Douglas Dreyer on behalf of the U.S. Government Publishing Office. The heart of this case is that Mr. Jeter failed to request reassignment to a vacant physician or to proffer medical evidence to support a request for accommodation. Because of Mr. Jeter's failure to maintain a commercial driver's license, he could not perform the essential function of his job as a motor vehicle operator, and he was ultimately terminated by the GPO. Where I'd like to start is with the formal policy GPO has, which is in the Joint Appendix at page 122. This was an attachment to the December 2013 letter that GPO provided to Mr. Jeter when it was seeking clarification to determine whether he was indeed requesting an accommodation. In that letter, the attachment shows that GPO's official policy is that reasonable accommodation does not include creating a new job. Now, what we've heard a lot here from my friend is talk about whether GPO could have created a new job for Mr. Jeter because GPO shuffled some job responsibilities around for other individuals when they were temporarily injured. But there is no evidence of any vacancy, and what was argued before the district court was that there was an implied vacancy and that GPO needed to put Mr. Jeter in that position because it had accommodated other people in the past. That type of argument leads to serious policy concerns with the ADA because it would make employers think twice before going above and beyond their obligations under the ADA when accommodating other individuals. How is it really going to create any problems for the GPO when, according to your friend on the other side, the GPO has a policy, I guess, per the OPM, which they are part of, that reasonable accommodations can include temporary light-duty assignments? So, OPM already says temporary light-duty assignments is a reasonable accommodation, and that's all he was asking for. So, GPO does have a temporary light-duty program, and Mr. Jeter received light-duty seven to eight times. That's noted in Mr. Robinson's deposition transcript. What we're dealing with here, though, wasn't a request for temporary light-duty. What Mr. Jeter has testified during the course of this litigation is that he wanted transfer to a desk job permanently because he believed his disability was permanent, even though Dr. Doran's September 2012 report had noted that his disability had ceased as of the time of that examination. Is that fact undisputed, counsel? Because isn't there evidence in the summary judgment record that he wanted temporary light-duty until he could get his CDL? It's undisputed in the form of Mr. Jeter's testimony in his deposition transcript, in which he said three times that he wanted transfer to a desk job. Permanently? Yes. Now, one thing we've heard from my friend is a discussion about when Mr. Jeter regained his CDL. That occurred in November 2017. What we were looking at with Mr. Jeter's deposition transcript there was his regaining of his learner's permit. And what's interesting about that, and that's on page 108 of the joint appendix, is the very next sentence after the question that was read in the first half of this argument was a question saying, and that, meaning Mr. Jeter regaining his learner's permit for CDL, that was based on you having said that you had no chronic low back pain and no narcotic or habit-forming drug use to correct. His answer is, I don't remember, but the application is in the record. At ECF number 55-21, and shows that Mr. Jeter wrote on his learner's permit application that he had no chronic low back pain. And so he's submitted an application calling into doubt the permanency of his injury. But what we saw in the reply brief is that, again, they go back to the language in Dr. Doerr in September 2012 letter regarding whether the back injury was permanent. And so they're really emphasizing that they're viewing this as a permanent injury, and there's a tension there between viewing this as a permanent injury and claiming that Mr. Jeter was just requesting temporary light duty. Now, at this point in late 2013, Mr. Jeter had effectively been not working in his job since approximately March 2009, with a couple of days in between where he would go in and then not do his job. And so he was on paid administrative leave during that time. Now, that's a lengthy time period that he's now saying he wants to extend even further with a transfer to a desk job. And that's really part of what I think is critical is just the timeline of how much GPO had accommodated this individual over the history. And so when they then ask him, it seems like perhaps he is trying to make a request for accommodation. They ask him for clarity. They ask him, what is it you want? They ask him to provide medical documentation to support it if that is what he wants. And he doesn't do that. What he does instead is he, in this litigation, disputes ever receiving the December 16, 2013 letter. But he also says that he had conversations with Robinson where he said, I want an accommodation. I want temporary light duty. That's what he says in affidavits that are attached to the summary judgment. So what's it supposed to do with that? Well, that's correct. And so he says that in early January, 2014, he had that conversation with Mr. Robinson that Mr. Robinson said, okay, if that's what you want, put in for it. Like, give us medical documentation to support it. And still he doesn't. And so even when you go to March, 2014. I thought his testimony was that he was never told by Mr. Robinson that the documentation that he already had, meaning the Doran letter from September, 2012, he was never told that that letter was insufficient, that that documentation was insufficient. Well, I would say that that would be contradicted by the December 16, 2013 letter, which explicitly requested more medical documentation. So there is the- It doesn't say more medical documentation. It says documentation of your disability. So somebody reading that, why wouldn't they think, okay, well, I've given that to you because I gave you the Doran letter from September, 2013. Well, I think that's the natural reading. But putting that aside, if you go to the March, 2014 oral reply, there, Mr. Jeter explicitly says that he should have had more medical documentation, that he should have brought medical documentation with him, and he didn't do it. And so even months later, even when giving his oral reply there, he still had not provided that. And after that, okay, perhaps the natural inclination would have been, well, I'll go get the medical documentation and I'll go provide it. Mr. Jeter did submit an untimely written reply. And still, still he did not provide medical documentation when there was no doubt at that point, certainly on March 10th, 2014, when he gave his oral reply, that he needed to provide additional medical documentation. So what about the policy for accommodation that was attached to that December, 2013 letter? And I'm looking at page JA-126. And it says that when the employee initiates the accommodation process, then the supervisor has to respond within 10 days. And then the supervisor is supposed to prepare a memo that the employee signs and sends to personnel or the EEO office. I guess what I'm getting at is appellant says that what he did was sufficient to require Robinson to have done more and that Robinson didn't comply with the policy. So if you're going to fault appellant for not doing everything he should have, you should similarly fault Robinson or GPO for not doing everything they were supposed to do. And your honor, in response to that, I'd refer to the paragraph at the top of the page there, which says if it is unclear whether an individual is requesting an accommodation, clarification should be sought. That's the antecedent question here was whether he was indeed requesting an accommodation. And so that is exactly what happened is GPO sent the December 16, 2013 letter, requesting clarification whether he was requesting an accommodation. We didn't get to this, the paragraph two below because we hadn't crossed that hurdle yet. So suppose we agree with you and we believe that the process broke down and it was the appellant's fault for it breaking down. Does that dispose of, is that sufficient in and of itself to dispose of both the ADA claim and the retaliation claim? I think this was briefed more in the context of the failure to accommodate claim. It would certainly dispose of the accommodation claim. I think the retaliation claim fails separately. And I noticed that the opening brief from my friend across the aisle tried to make the issue apply to both claims, which wasn't really the way it was briefed below at the district court level. Certainly it makes it more sense. It makes it even more understandable why GPO did what it did because there was this breakdown from Mr. Jeter in the process. Suppose council GPO had told Mr. Jeter that we would normally, we have in the past provided drivers who were injured with light duty jobs, but we don't like you. So we're not going to provide it for you. What response? So if the reason had nothing to do with any protected activity, I don't think that would give rise to liability. I do think what we have here is a big difference between the accommodations that were provided to the four individuals mentioned in the Robinson Declaration on page 152 of the joint appendix and what it is that Mr. Jeter was requesting here. And sometimes it seems like this is being a little collapsed in this discussion, but there were these four individuals, Monique Jones, Marvin Jones, Bobby Graham, and Robert Corby. First, I'm talking about retaliation now, right? Right. I'm giving you a hypothetical. And your answer is that would not be retaliation unless it was linked squarely to protected activity, not because you're a no good SOB. Right. That is correct, Your Honor. But, and where I was going separately was just the Robinson Declaration shows that these four individuals were not assigned to a clerical desk job type position. They just had their duties shuffled so that they were on light duty, taking care of light duty tasks. They weren't slotted into a desk job position. What it says on page 153 of the joint appendix is that there was a clerical position at this time and it was held by Phyllis McKelvin. And so Phyllis McKelvin was holding that job up till 2015 when the job was eliminated. Now, there was another individual who had held a similar position that had been eliminated in 2012. GPO had not filled that. But there isn't a vacancy in a clerical position at this time. That's not what Robinson's Declaration is saying. So it's not the case that they could, that GPO had a position to fill here. And something just helpful in the background is that this is at a time when GPO's workforce has been shrinking. At GPO's height, it had about 8,500 employees, as my friend correctly said. Nowadays, its workforce is much smaller than that. It's in the 1,300 to 1,750 range and it has been contracting. And so that's why positions of, like when Sammy Arthur's position was eliminated in 2012, it wasn't filled again. There's no evidence of a vacant position that Mr. Jeter could have been assigned to. But I guess I'm trying to understand your argument about what happened with others who had some sort of temporary disability or injury. You're saying that they didn't necessarily get a desk job. They got some sort of light duty where maybe their duties were kind of shuffled around so that they would be able to avoid having to do anything that would implicate their disability or their injury. I'm trying to understand what difference that makes here. I mean, isn't Jeter's argument then fine if that's what you want to call it, then call it that. Just give me that. That's all I wanted. I wanted some sort of an accommodation. So in response to that, your honor, I'd point to paragraph five of the Robinson Declaration on page 152 of the joint appendix. He says, there were no vacant positions that were filled and no temporary positions created for these employees. So the evidence in the record is that these individuals were not reassigned to other positions. They had their duties shuffled. Now, why that matters is that it is Mr. Jeter's burden in litigation to demonstrate that there is a vacancy to which he could have been reassigned. And the ACCA case makes that point. This is really, in ACCA, there's an entire dispute. This was an antecedent question to ACCA too. Everyone recognized that there needed to be a vacancy in order for an employee to be reassigned to it. And so this matters because this shows that these positions weren't vacancies and these aren't examples of Mr. Robinson creating a new job for someone as an accommodation. I don't have any further questions. All right, Judge Katsos, any further questions? Nor do I, thank you. All right, thank you. Mr. Hurst, we'll give you two minutes for rebuttal. Thank you, your honor. The first point I wanna make is that it is disputed whether Jeter was requesting a permanent reassignment. I would point you to Joint Appendix, page 110. That is Jeter's declaration and it shows that he was requesting temporary desk work. My second point is about the interactive process. I wanna talk about November of 2013. GPO knew that he was requesting a reasonable accommodation. Their own memo demonstrates that. I would encourage your honor to look at page 187. After the meeting, they said, we know he wanted to transfer to a desk position and that's in Boyd's memo. So the fact that they never responded to his request for a reasonable accommodation within 10 days shows that they broke their own policies. And as a district court noted, there is no evidence that they ever talked about a reasonable accommodation despite three requests. And the formal policy makes clear that if they wanted additional medical information, it should come from the Occupational Health Division after the supervisor had responded in writing. And that is when a Form 838 has been prepared and the chief medical officer had made an evaluation. That point is on Joint Appendix 126 to 127. We never got anywhere near that because there is no evidence they ever talked about a reasonable accommodation. And that is a breakdown of the interactive process. Thank you, your honors. I should like to comment. It seemed to me the University of Virginia group without regard to the merits of the case  Oh, thank you very much, your honor. Thank you very much, your honor. Yes, I would wholeheartedly confirm that the court appointed you and you acquitted yourselves very well. Thank you. Thank you, your honors. We'll take the case under advice.
judges: Wilkins, Katsas, Silberman